OPINION BY BENDER, P.J.E.:
Appellant, Patrick Gorman, appeals from the judgment of sentence of 11 ½ to 23 months' incarceration, followed by 5 years' probation, imposed after he was convicted of theft and related offenses. Appellant solely challenges the sufficiency of the evidence to sustain his convictions. After careful review, we affirm.
On April 24, 2015, a criminal information was filed against Appellant, charging him with two counts of theft by unlawful taking, 18 Pa.C.S. § 3921(a) ; one count of receiving stolen property, 18 Pa.C.S. § 3925(a) ; and two counts of misapplication of entrusted property, 18 Pa.C.S. § 4113(a). These charges stemmed from Appellant's creating a veteran's honor guard that appeared at numerous funerals, and then mishandling and misusing donations provided to that honor guard. Appellant waived his right to a jury trial and proceeded to a non-jury trial on January 6, 2016. On January 12, 2016, the court convicted Appellant of the above-stated charges. On April 7, 2016, Appellant was sentenced to the terms of incarceration and probation stated supra , as well as restitution in the amount of $44,312.93.
Appellant filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Appellant raises the following issues for our review:
1. The evidence was insufficient to support Theft by Unlawful Taking (Counts 1 and 2), as the government failed to prove beyond a reasonable doubt [that Appellant]:
*1037 (a) took or exercised control over certain property, namely money and/or checks, belonging to the American Legion Post 935 and/or 1810,
(b) taking or exercising control over certain property, namely money and/or checks, was unlawful because the money and/or checks were not intended for the use and/or benefit of the American Legion Post 935 and/or 1810, and/or
(c) intended-that is, it was his conscious object-to deprive American Legion Post 935 and/or 1810 of the use and benefit of certain property, namely money and/or checks.
2. The evidence was insufficient to support Receiving Stolen Property (Count 3), because the government failed to prove beyond a reasonable doubt that:
(a) the property, namely money and/ or checks, was in fact stolen from the American Legion Post 935 and/or 1810, and/or
(b) [Appellant] received, retained or disposed of the property knowing or believing it had in fact been stolen from the American Legion Post 935 and/or 1810.
3. The evidence was insufficient to support Misapplication of Entrusted Property (Counts 4 and 5), as the Government failed to prove beyond a reasonable doubt:
(a) certain property, namely money and/or checks, was entrusted to [Appellant] for the use and benefit of another, or
(b) [Appellant] applied or disposed of the property in a manner he knew was unlawful and involved substantial risk of detriment to the owner or the person for whose benefit the property was entrusted.
Appellant's Brief at 3.
We begin by setting forth our well-settled standard of review:
In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Commonwealth v. Moreno , 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. Commonwealth v. Hartzell , 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. Moreno, supra at 136.
Commonwealth v. Koch , 39 A.3d 996, 1001 (Pa. Super. 2011).
Next, we provide the definitions of the three offenses for which Appellant was convicted. First, Appellant was convicted of two counts of theft by unlawful taking, both graded as felonies of the third degree. "A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a). "[T]heft constitutes a felony of the third degree if the amount involved exceeds $2,000...." 18 Pa.C.S. § 3903.
Second, Appellant was convicted of one count of receiving stolen property, defined as follows: "A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner."
*1038 18 Pa.C.S. § 3925(a). Additionally, we note that "the word 'receiving' means acquiring possession, control or title, or lending on the security of the property." 18 Pa.C.S. § 3925(b).
Third, Appellant was convicted of misapplication of entrusted property. "A person commits [this] offense if he applies or disposes of property that has been entrusted to him as a fiduciary, or property of the government or of a financial institution, in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted." 18 Pa.C.S. § 4113(a).
We now discuss the evidence presented at Appellant's trial to prove these three offenses. In this vein, we adopt the Commonwealth's summary, which we find to be a thorough and accurate recitation of the evidence, presented in the light most favorable to the Commonwealth as the verdict winner:[1]
The pertinent facts are as follows. From December of 1998 until October of 2010, Appellant was a member of the American Legion Post 935, which operated out of Baldwin. ( [Notes of Testimony ("NT"), 1/6/16-1/12/16, at] 76). He was the Commander somewhere between 2004 to 2008. (NT 87, 94). Appellant operated the Military Veterans Honor Guard ["MVHG"] under the auspices of American Legion Post 935, which he formed in 1998. (NT 76, 95). Russell Pontow, the Adjutant of the Post (i.e. , the secretary), participated in formation of the Honor Guard with Appellant and was a member of it throughout the years. (NT 76-78). Al Priano and Guy Priano also assisted Appellant in forming the Honor Guard. (NT 96). A bank account was opened in 1998, and it was funded by Post 935 until approximately 2002 or 2003 when the Honor Guard began receiving sufficient donations to fund itself. (NT 96-98, 109). The Finance Officer was supposed to reimburse the Honor Guard for uniform expenses, [and] mileage for group carpools. (NT 93). The men had a verbal agreement that because they were part of the American Legion everything belonged to Post 935. (NT 99-100, 109). They wore a white shirt with American Legion decals, blue or black jackets with American Legion decals, and hats that stated "Nix-Vogel American Legion." (NT 78, 90-92). The firearms were loaned from the Army, and ammunition was sent free from the Army Depot. (NT 85-86). Appellant attended the orientation and certification provided by the Army with Mr. Pontow. (NT 79). Once every three years they receiv[ed] certification training, but to the best of Mr. Pontow's recollection it never covered reimbursements. (NT 100-03, 108). All the donations received by the Honor Guard were to purchase uniforms and flags and a flag holder for the deceased's gravesite, and anything leftover was to be for the betterment of the American Legion. (NT 79-80, 107-08).
Appellant was never given carte blanche by American Legion Post 935 to do whatever he wanted with the Honor Guard and its bank account. (NT 110). He never expressed any misunderstanding or ambiguity with the rules and bylaws of Post 935. (NT 112). Because Appellant had not been presenting finances to the Finance Officer, in 2009 Appellant was questioned by the Commander about financial documentation.
*1039 (NT 81). At a September meeting before the membership when Appellant was questioned[,] he refused to answer and said the only people that needed to know about the finances were members of the Honor Guard. (NT 81-83). Appellant was repeatedly asked by the leadership to provide financial records, and he would not provide documentation or engage in any discussions. (NT 84). Appellant was told by the Commander that the money generated by the Honor Guard was not his personal money. (NT 88). He was sent a certified letter by the Board of Directors to appear at a meeting, and Appellant failed to show. (NT 84). In the summer of 2010, Appellant was removed from the head of the funeral detail and restricted from use of Post 935 "for conduct unbecoming an American Legion Veteran." (NT 85). Post 935 was unable to conduct an inquiry into the status of the Honor Guard's finances as Appellant closed the bank account. (NT 85).
Henry Manella, the Post Quartermaster of ... [ ]VFW[ ] Post 1810, testified that their Post, which operated out of Brentwood, had about 700 members. (NT 6). He was a past Allegheny County District Commander of the various VFW posts. (NT 6). Mr. Manella encountered Appellant in 2010 when Appellant was a full member of the VFW. (NT 24). At the time, Mr. Manella was Post Commander, and Appellant approached him and the post members about restarting a Military Funeral Honor Guard. (NT 7-8, 29-30). Appellant stated that he had members for the Honor Guard and all they needed were the rifles belonging to Post 1810. (NT 8). Mr. Manella got approval from the post members for Appellant to create a Military Funeral Honor Guard. No official contract was signed between Appellant and VFW Post 1810 about the Military Funeral Honor Guard. (NT 26). Mr. Manella conducted an inventory of their weapons, provided the weapons from Post 1810 to Appellant, and then began to order ammunition from Fort Dix for the funeral services. (NT 9-10, 26). He would sign the paperwork from Appellant for ordering ammunition when Appellant needed it. (NT 10). The ammunition was shipped direct[ly] to Appellant's residence; it was free. (NT 10, 27). The members of the Honor Guard wore black pants, jacket, and shoes with a cap that said Post 1810 Color Guard. (NT 19-20, 28). Mr. Manella always asked if Appellant needed anything for the Honor Guard and Appellant said nothing other than to request $200 for flag covers to present to the family members of the deceased. (NT 20). Mr. Manella did not know how the group paid for their uniforms. (NT 31). The funeral directors reached out to Appellant directly and not Post 1810 for the Honor Guard. (NT 33).
All Mr. Manella knew about the Honor Guard's activities is that they received a $50 stipend for doing a United States Army funeral, and he had no knowledge that the group was receiving donations. (NT 11-12, 17). The Quartermaster's job of Post 1810 was to control all funds, and provide a report at the monthly meeting about who received money (e.g. , the Color Guard) and then the "Quartermaster disburses funds received from donations or anything like that." (NT 12). According to the bylaws of the VFW, everything had to go through Post 1810's checking account for disbursement. (NT 15, 34-35).
E. Richard Williams was a member of the VFW Post 1810 Military Funeral Guard with Appellant for one year before Appellant was removed from the position.[3](NT 114). He played the snare drum, and joined the Honor Guard in *1040 approximately February of 2013 after receiving Appellant's contact information from Post 1810. (NT 116-18, 129). They all wore identical hats that said VFW 1810, and their jackets and shirts had a patch stating VFW 1810 and another stating Honor Guard. (NT 119-20). Members were awarded a $50 stipend from the Government that was paid directly into their personal accounts for participating in a military burial. (NT 120). Appellant played favorites with members of the Honor Guard and ensured that some received the stipend and went out to lunch with him. (NT 121-22, 136-37). Mr. Williams consistently saw funeral directors or family members of the deceased give Appellant business envelopes that he would place in his pocket. (NT 123, 138-39). At the same time, Mr. Williams had to buy his own boots and pants for the uniform. (NT 123, 134-36). Also, he routinely saw Appellant excessively tip waitresses at lunches. (NT 139-41).
[3] Mr. Williams did not receive certification training until after Appellant was removed from the Honor Guard. (NT 131-32).
With the help of other individuals, Mr. Williams was able to obtain a statement from the bank account. (NT 124-26). In 2014, it was brought to Mr. Manella's attention that Appellant had a prayer card he gave out at funerals with his name and home address listed for donations. (NT 11-12; Commonwealth Exhibit 2). Mr. Manella then learned that Appellant had a separate checking account. (NT 13). A random inventory check of the rifles was conducted, and they were seized from Appellant by Post 1810. (NT 14). When asked about the prayer card with his private address for submitting donations, Appellant had no response. (NT 15). Mr. Williams recalled how Appellant was confronted with the fact that he should not be using Honor Guard funds for his personal use, and he acted confused and pretended he had no idea what they were talking about. (NT 125-26). Mr. Manella also asked Appellant about the checking account and his EIN number. (NT 15). The incoming Post-Commander removed Appellant from all his duties with the Honor Guard of Post 1810. (NT 18). Mr. Williams was concerned about Appellant's embezzlement of funds and possible falsification of funds to the Army for stipends, so he approached law enforcement officials. (NT 127-28).
Garrett Robert Reid, a member of the Army Reserve as a Master Sergeant and Senior Observer Controller Trainer, appeared and testified not as a member of the Army, but as [an] individual. (NT 163-64). He encountered Appellant in the summer of 2010 when they conducted military funerals together. (NT 265-66). The veterans' groups, which were part of the AP-3 program, were there to assist at funerals. (NT 266). At that time, the program director of the AP-3 program and the Military Honors section out of Pittsburgh requested that he conduct various trainings with veteran[s'] groups and certify them on the funeral details and administrative procedures. (NT 266-67, 287). They were instructed on etiquette at the funeral. (NT 265-66). They were instructed not to receive cash, and that all donation checks were to be made payable to the Veterans honor guard of their post-i.e. , Honor Guard, VFW Post 1810. (NT 266, 287). The groups were instructed not to actively solicit donations. (NT 287-88). Pursuant to the AP-3 Program, any donations the groups received were to be deposited into the post's Honor Guard account with three signatories on the account, and the Post was to decided *1041 how to use the money. (NT 268-68, 272-73, 287-88, 292-94). Members' uniforms and gas were acceptable expenses. (NT 273, 292). Between 2012 and 2014, Mr. Reid trained Appellant three times on these procedures. (NT 269). Mr. Reid knew Appellant had received training prior to these years, and also knew that Appellant was told no Honor Guard could be conducting activities without being attached directly to one of the major veterans associations, e.g. , American Legion, VFW, a Korean War veterans association, or a Marine Corps league.[4](NT 270-72, 301).
[4] Another Army Reserve member, Eric Peter Gass, testified in his personal capacity on behalf of the defense. (NT 303-08). He was a trainer with the AP-3 program from 2007 until 2011 or 2012. (NT 308-11). Mr. Gass trained Appellant on the $50 stipend reimbursement that was authorized by The National Defense Act of fiscal year 2000. (NT 312-13). It was his opinion that [Veterans Service Organizations ("VSO") ] honor guards could solicit as well as accept donations, that honor guards did not have to be part of any VSO, and Appellant could accept personal checks. (NT 314-17, 340). Nevertheless, he conceded that he trained Appellant as a member of a VSO organization at a post facility. (NT 334). Furthermore, on cross-examination, Mr. Gass clarified, "I'm not involved with the VFW, or the American Legion, or the [VSOs], other than performing and executing Military Funeral Honors on the date we are prescribed to attend." (NT 322). He was of the opinion that if Appellant's Honor Guard was a member of a VSO organization, how the check was addressed was between him and the VSO. (NT 340). Additionally, Mr. [Gass] posited that who the checks were addressed to was "vetted through the funeral home." (NT 336). Notably, Mr. Gass's ex-girlfriend received money from Appellant for furniture. (NT 338-39).
As Appellant declined [with] age, Mr. Reid, who also participated in the military funerals with Appellant on an almost daily basis, saw Appellant not adhering to training directives. (NT 278-79, 298). Most significantly, Mr. Reid witnessed Appellant, "walking up to Funeral Directors, and reaching out his hand, and going like this (indicating), and saying, did you write that out to Pat, did you write that out to cash, and/or where is the cash in the envelope." (NT 279, 298). On multiple occasions, Mr. Reid saw Appellant take envelopes from funeral directors and he thought it to be some form of cash or check. (NT 280-81, 300-01). Mr. Reid repeatedly told Appellant that he should not be accepting cash or personal checks, and the donations should be made out the Honor Guard of the post. (NT 281). Appellant did not reply, or he snickered at Mr. Reid. (NT 281). Mr. Reid also tried to speak with the funeral directors about how they were to address checks for the VSO honor guards. (NT 299-300).
As the trial court aptly summarized:
While testimony varied somewhat among the numerous funeral directors called, the consensus was that the money donated was to go for dry cleaning, uniforms, gas money, lunch money, the replenishment of bullets fired and similar expenditures. [ ] Testimony further established that [Appellant] asked that checks be made out to him or cash. The perception of many of the funeral home directors was that they were dealing with either the VFW or American Legion when *1042 [Appellant's] Honor Guard appeared. The testimony reflected that it was not the intent to personally give money to [Appellant], but rather to give the money to the groups that had been affiliated with either the VFW or the American Legion.
(May 17, 2017 Trial court Opinion, p. 5) (NT 65-71, 73, 145-48, 151-54, 157-60, 161-69, 173-86, 195-96, 199-204, 209-16, 223-28, 233-34, 236-43, 253-61, 345-50, 352-53, 355-60, 417-25). Similar testimony was elicited from families of the deceased who intended their donations to go to the Honor Guard. (NT 39-50, 54, 56-62) (NT2 10-11, 16).[5]
[5] Numerals in parenthesis proceeded by the notation "NT2" refers to pages of the November 23, 2015 Preservation of Testimony transcript.
Allegheny County District Attorney's Office Detective Jacquelin Weibel, who received her Master's Degree in Fraud and Forensics and is a Certified Fraud Examiner, received a complaint about Appellant['s] diverting Honor Guard funds for his personal use from Mr. Williams of VFW Post 1810. (NT 365, 386). She quickly realized there were two banks accounts involved at ESB Bank. One account was American Legion Post 935, and the second account was Military Veterans Funeral Honor Guard-i.e. , the VFW account.[6] The American Legion account was closed around October of 2010 with approximately $1,000.00 remaining, and the VFW account was opened at that time with a similar amount of money. (NT 366, 389; Commonwealth Exhibits 23-26[ ] ). There were signatories on one account with Appellant-Anthony Bucci, and Leonard Oberle.[7](NT 367, 389; Commonwealth Exhibit 23). None of the checks deposited into the accounts were endorsed by Appellant personally, and if they were they were countersigned Military Veterans Honor Funeral. (NT 389-92). Detective Weibel also obtained search warrants for Appellant's personal credit card bills from Capital One and First National Bank of Omaha as she saw money going out of the VSO accounts to pay these bills. (NT 377-78, 392). Essentially, Appellant would write checks from the ESB Bank accounts to pay his credit card bills. (NT 394-95, 404-05, 413).[8]
[6] During her investigation, the detective recovered no written fiduciary agreements between Appellant and the [VSOs]. (NT 402, 406). However, her investigation revealed that the Honor Guards were part of the VSOs. (NT 407). Therefore, the Honor Guards had to depend on the rules of VSOs, including the fact that the members of the VSOs voted on how money was to be disbursed. (NT 408). At one point, Appellant held positions and Commander and Treasurer in the VSOs. (NT 408).
[7] Detective Weibel interviewed Mr. Bucci who went to the bank at one point after hearing rumblings about Appellant['s] misappropriating money. (NT 412). Mr. Bucci was shocked to find money was being spent on non-Honor Guard expenses. (NT 412).
Mr. Oberle was a member of the Honor Guard with Appellant at the American Legion, and left with him to join the VFW post. (NT 439). They redesigned the American Legion patch for their uniforms to hide the American Legion information and state "Military Funeral Honor Guard." (NT 439, 442-43). Like Appellant, he was of the opinion that neither the American Legion nor VFW "said to us that we should be accountable to them for our donation money." (NT 444, 447-48). Nevertheless, he *1043 conceded that the Honor Guard money should not have been used for personal credit card bills, to buy furniture, or to pay country club bills. (NT 449-50).
[8] She did not include in her forensic analysis the checks from the ESB accounts that were made payable to Appellant or to cash, which Appellant stated he used for Honor Guard expenses or for meals. (NT 395).
Detective Weibel interviewed Appellant in October of 2014. (NT 381). Appellant was asked to bring receipts, but he brought none and informed Detective Weibel that he did not keep any. (NT 398). She went line-by-line through various expenditures with Appellant to determine if they were legitimate or arguably legitimate expenses. (NT 381-82, 404-05). Appellant claimed at one point that his son had possibly [used] ... his credit card. (NT 382). He conceded that some of the charges were not Honor Guard expenses, but that the VFW and American Legion did not financially support the Honor Guards and they did not have a right to the donations which were to be spent on Honor Guard expenses. (NT 384). When pressed as to how a water bed and furniture constituted Honor Guard expenses, Appellant had no reply. (NT 384). Appellant provided a[n] EIN number for the VFW account, and at no point did he state that he was running his own business or his own Honor Guard. (NT 385, 388). A search of the EIN number did not reveal that it was for a nonprofit organization. (NT 387-88).
Ultimately, Detective Weibel determined that from the American Legion account, $5,490.33 was misappropriated and $5,024.60 was theft for a grand total of $10,514.93. Out of the VFW account, $16,614.38 was misappropriated and $17,183.62 was theft for a grand total of $33,798. (NT 22 379; Commonwealth Exhibits 25-26). Items that could have possibly been Honor Guard expenses that might have been approved by the VSO (e.g. , meals, checks to individuals other than Appellant) were deemed misappropriations. (NT 376-77). Anything that was not a legitimate Honor Guard expense (e.g. [,] Wine and Spirts, payments to country clubs, vehicle repairs, vehicle registration, oil changes, online purchases from PayPal, herbal remedy drugs, attorney fees, computer expenses, furniture totaling $2,204.13 from Value City, water bed expenses, Ticket Master expenses, Verizon expenses, medi-care service expenses, iTunes charges, and Amazon charges) were deemed theft. (NT 378-81, 383).
Commonwealth's Brief at 11-23 (some footnotes omitted).
We now address Appellant's specific challenges to the sufficiency of the evidence to support his convictions, addressing each offense in turn.
Theft by Unlawful Taking
In challenging his theft convictions, Appellant first asserts that a total of $7,450 in checks made payable to the VFW were deposited into the Military Funeral Honor Guard ("MFHG") account, yet the Commonwealth alleged that he stole $17,183.62 from the VFW Post 1810. According to Appellant, "more could not be stolen from [the VFW] than [what] was donated to [that organization]-to wit: $7,450.00." Appellant's Brief at 38.
Appellant's argument is meritless. The Commonwealth's evidence demonstrated that the MFHG account was opened by Appellant when he began running the honor guard under the auspices of the VFW Post 1810. Garrett Reid informed Appellant that the honor guard must be 'attached'
*1044 to a VSO, such as a VFW, and that any donations received by the honor guard were the property of that organization. Accordingly, any donations deposited into the MFHG account-whether made payable to the VFW, the honor guard, MFHG, or to Appellant personally-constituted property of the VFW Post 1810. This fact explains why the amount Appellant was charged with stealing from the VFW exceeded the amount of the checks made payable just to that organization.
Appellant also claims that his theft convictions cannot stand because he spent the donations in accordance with the donors' intent, which was that the money be utilized for the benefit of the honor guard. Appellant insists that, had he adhered to the American Legion's and the VFW's requirements that the disbursement of funds be approved by the members of those organizations, the funds would not have been used in the manner intended by the donors.
Initially, the intent of the donors is wholly relevant in assessing whether Appellant stole money that belonged to the American Legion or the VFW. In any event, Appellant's theft offenses were premised on money he spent on personal items , such as furniture and country club memberships. Thus, even if the donors' intent controlled, Appellant's spending was clearly not in line with that intent.
We also reject Appellant's claim that he cannot be found guilty of theft because he "was handling the checks/donations in accordance with his AP-3 training[,]" which provided that honor guard funds should be held in a separate account. Again, it was Appellant's spending of honor guard donations on personal items that was the basis for his theft convictions, not the fact that he had a separate bank account for the honor guard.
Next, Appellant alleges that Detective Weibel improperly considered legitimate honor guard expenses as personal expenditures by Appellant. For instance, Appellant claims the detective should not have included in the theft total "such matters as an On-Star navigation system for [Appellant's] personal vehicle which he used to travel to cemeteries[,]" and "costs of repairs and maintenance of [Appellant's] vehicle which he used to transport himself and others to and from cemeteries for honor guard services....." Appellant's Brief at 40-41.
Again, Appellant's argument is meritless. Even if Detective Weibel did err by including such expenditures in totaling Appellant's theft amounts, that fact does not render the evidence insufficient to support his theft convictions. The Commonwealth only had to demonstrate that Appellant stole an amount in excess of $2,000 from both the American Legion and the VFW. Appellant makes no claim that excluding the expenses he challenges would have lowered the amount he spent on personal items to $2,000 or less. Thus, his challenge to some of the particular expenditures considered by Detective Weibel as theft sounds more in an attack on the restitution amount imposed in his case than a sufficiency-of-the-evidence claim.
Finally, Appellant alleges that the Commonwealth failed to prove that he intended to deprive the American Legion or the VFW of any money. Essentially, he claims that he believed, based on information provided to him during AP-3 training, that his honor guard was a separate entity from the American Legion and/or VFW. Alternatively, he maintains that he did not know that the bylaws of those organizations precluded him from using the donations in the manner in which he did.
This argument is wholly unconvincing, given the Commonwealth's evidence discussed *1045 supra . Specifically, the Commonwealth presented testimony establishing that Appellant was informed, and understood, that the honor guard had to be affiliated with a VSO. Appellant's honor guard was first affiliated with American Legion Post 935, and then with VFW Post 1810. Appellant and the other honor guard members wore clothing bearing the insignias of these two organizations during the funeral services at which they performed. Appellant was informed by several different individuals, and on several different occasions, that the money donated to the honor guard was not his personal property. Nevertheless, Appellant spent honor guard donations on personal items such as furniture and country club membership fees. These facts amply demonstrated that Appellant intentionally took money from the American Legion Post 935 and the VFW Post 1810, thus supporting his theft convictions.
Receiving Stolen Property
In Appellant's second issue, he challenges the sufficiency of the evidence to support his receiving stolen property conviction. Aside from reiterating some of the same arguments we have rejected supra , Appellant claims that the evidence was insufficient to prove that he received stolen property because he did not do anything that exhibited a guilty conscience, he believed it was his son who misused funds from the honor guard, and he "replenished the honor guard account" with his own money after discovering this improper spending. See Appellant's Brief at 47, 49. According to Appellant, these facts "negat[e] the element that [Appellant] knowingly diverted funds to pay for items inconsistent with the issuers'/donors' intentions, ... but Det[ective] Weibel ... failed to take into account [Appellant's] deposit[ing] funds from his personal check[ing] account into the honor guard account." Id. at 49.
Preliminarily, even accepting Appellant's claim that there was no evidence of his guilty conscience, that fact has no bearing on the sufficiency of the evidence presented by the Commonwealth. Additionally, Appellant does not cite to any evidence offered at trial to prove that it was his son who spent money from the honor guard accounts on personal items. Lastly, Detective Weibel testified that she subtracted deposits that Appellant made from his personal account into the honor guard account from "the total amount of the theft, in essence, [giving Appellant] credit as if he reimbursed the bank account." N.T. Trial, 1/6/16-1/12/16, at 379. Even subtracting Appellant's 'reimbursements,' the detective's total for the amount Appellant spent on personal items from the VFW account alone was $17,183.62. Appellant had no explanation for many of these expenditures. Given this evidence, we conclude that Appellant's challenge to the sufficiency of the evidence to support his receiving stolen property offense is meritless.
Misapplication of Entrusted Property
In Appellant's third and final issue, he claims that the Commonwealth's evidence failed to prove that he committed the crime of misapplication of entrusted property. In this vein, Appellant argues that he "was a fiduciary to the donees/issuers of the donation and was duty-bound to apply the funds consistent with their intended purpose[,]" which was specifically for the benefit of the honor guard. Appellant's Brief at 55. Appellant claims that he spent the money in accordance with the donors' intent and, had "he turned the funds over to the [American Legion] or VFW," the money would have been spent on things "unrelated to the support of the honor guard." Id. Appellant also reiterates his argument that checks not made payable *1046 to the VFW or the American Legion constituted funds that "were not subject to the restrictions of any voting requirement or other reimbursement limitation of either the [American Legion] or VFW." Id. at 52.
Again, the intent of the donors, and to what organization or person their checks were made payable, are irrelevant. Appellant was not a fiduciary of the donors. Instead, by acting as the administrator of the honor guard, which was operated under the auspices of the American Legion Post 935 and the VFW Post 1810, Appellant was a fiduciary of those VSOs. See 1 Pa.C.S. § 1991 (defining "fiduciary" as "[a]n executor, administrator, guardian, committee, receiver, trustee, assignee for the benefit of creditors, and any other person acting in any similar capacity"). Thus, any donations Appellant received, regardless of the payee set forth on the checks, was the property of the VSO under which his honor guard was operating when the donation was made. The evidence was sufficient to prove that Appellant knowingly disregarded the bylaws of the VSOs, which required membership approval for disbursements, and spent those organizations' money as he saw fit. As the Commonwealth points out, "[w]hile the misappropriations probably were consistent with how the VSOs would have used the money and the intention of the donors, the fact of the matter remains that it was not Appellant's decision to make." Commonwealth's Brief at 25-26. We agree, and reject Appellant's sufficiency-of-the evidence challenge.
In sum, our review of the record confirms that the Commonwealth presented more than adequate proof that Appellant committed two counts of theft by unlawful taking, one count of receiving stolen property, and two counts of misapplication of property. Accordingly, we affirm Appellant's judgment of sentence.
Judgment of sentence affirmed.

Notably, Appellant does not take issue with any aspect of the Commonwealth's summation.