J-S35020-25

2025 PA Super 263

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:   PENNSYLVANIA
:
v.   :
:
:
STEFAN BERNARSKY   :
:
Appellant   :   No. 1041 MDA 2024

Appeal from the Judgment of Sentence Entered January 30, 2024
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0001036-2020

BEFORE:  OLSON, J., MURRAY, J., and LANE, J.

OPINION BY MURRAY, J.:           **FILED: NOVEMBER 24, 2025**

Stefan Bernarsky (Appellant) appeals from the judgment of sentence imposed following his jury convictions of theft by unlawful taking, theft by failure to make required disposition of funds received, theft by deception – false impression, theft by deception – failure to correct, and misapplication of entrusted property.[1]  After careful review, we affirm.

This case arises from Appellant's management of funds held in the Bernarsky Family Trust (Trust), for which Appellant was the sole trustee. Relevantly, Appellant had previously worked in the financial industry. Appellant participated in a financial advisor training program through Morgan Stanley and became a registered broker with the Financial Industry Regulatory

---

[1] 18 Pa.C.S.A. §§ 3921(a), 3927(a), 3922(a)(1) and (3), 4113(a).

Authority. N.T., 11/1/23 (p.m.), at 62. Appellant was a registered broker for approximately a year-and-a-half. *Id.*

### Trust Creation

Appellant is the grandson of Michael Bernarsky, Sr. (Michael Sr.), and Bernadine Bernarsky (Betty) (collectively, Grandparents). Grandparents had two sons, Michael Bernarsky, Jr., who is Appellant's father (Father),[2] and David Bernarsky (Uncle). At some time between 2012 and 2013, the family decided that Grandparents would need to move into an assisted living facility. Grandparents granted powers of attorney to Father and Uncle to aid their transition into an assisted living facility. Grandparents also sold their home "and generated proceeds of roughly sixty thousand dollars ($60,000.00). [Father] testified that he provided to Appellant[] his half of the proceeds from the sale of that residence." Trial Court Opinion, 3/19/25, at 5.

The trial court summarized Father's testimony concerning the family's financial planning and the subsequent creation of the Trust:

> [Father, Uncle, and Grandparents], along with Appellant, met with representatives from an annuity company in Scranton, Pennsylvania. [Father] testified that at the conclusion of the meeting, Appellant advised [Father, Uncle, and Grandparents] to not make a decision regarding the annuity at that time. … Appellant offered to act as trustee and manage the funds in relation to paying the bills for the assisted living for [Grandparents].

---

[2] Appellant also has a sister, Sonya. His mother, Mary Scarpetta (Ms. Scarpetta), and Father later separated.

[Father] testified that it was later agreed to allow Appellant to act as trustee for the … Trust upon its creation. [The rationale for creating the Trust was to transfer certain assets belonging to Grandparents out of their name, so as to enable them to become financially eligible for a government assistance program through the Department of Veterans Affairs that would defray the cost of the assisted living facility.] … [Father] stated that after an initial meeting with [James Gillotti, Esquire (Attorney Gillotti),] on his own, a subsequent meeting related to the creation of the … Trust was conducted. [Father, John Krisa, Esquire (Attorney Krisa),[3]] Attorney Gillotti, [Uncle], and Appellant attended that meeting[,] where Attorney Gillotti presented information about the formation and operation of the [T]rust and would draft the document for their review. [Father] stated that several weeks later[,] the same individuals attended another meeting where Attorney Gillotti presented to them the [T]rust document, which … was dated September 10, 2013. [Father] testified that the … Trust document was subsequently executed by him, [Uncle], and Appellant, as trustee.

[Father] indicated that during that meeting, Attorney Gillotti reviewed the [T]rust document with all individuals present and explained to Appellant his duties as trustee. … [T]he [T]rust was funded through an E-Trade account [(the Trust account)] containing 3,000 shares of Proctor & Gamble [s]tock, [purportedly] worth approximately $280,000.00 to $300,000.00.

*Id.* at 5-6, 8 (citations to record omitted; footnote added). Father and Uncle were the named beneficiaries of the Trust.

During trial, Attorney Gillotti confirmed that he drafted the Trust, for the purpose of transferring some of Grandparents' assets out of their names, which would allow them to qualify for Veterans Affairs benefits. N.T., 10/30/23, at 26, 48-49. Attorney Gillotti testified that the Trust permitted the

---

[3] Attorney Krisa is Father's longtime friend. Father first consulted with Attorney Krisa, who referred Father to Attorney Gillotti.

trustee to "distribute principal to members of a class consisting of [Father,] [Uncle,] and [Grandparents'] grandchildren." *Id.* at 54. Attorney Gillotti then explained:

> But there's a very important provision at the top of Page 3. It's so important that when I drafted the agreement I put it in bold type. [The provision provided t]hat there could be no distribution of principal made from the [T]rust to [Father and/or Uncle] or any other decedent [*sic*], including a grandchild, while at least … one of them[, *i.e.*, Michael Sr. or Betty,] was alive **without the approval of the distribution committee**. And the distribution committee [provided for] in section six was [Father] and [Uncle], the two sons.

*Id.* (emphasis added); *see also id.* at 55 (Attorney Gillotti clarifying that distributions of principal "could not be made without the **unanimous written consent** of the distribution committee." (emphasis added)), 65 (reiterating that the distribution committee, *i.e.*, Father and Uncle, had to provide consent for any distribution of principal). According to Attorney Gillotti, such language "prevent[s] the trustee from using his power over the [T]rust assets in a way that might favor one family member over another, especially favoring the trustee." *Id.* at 56.

Relevantly, Trust provision 3.7.1 sets forth Appellant's powers and duties while acting as the fiduciary:

> Make investments using the judgment and care under the circumstances that persons of prudence, discretion, and intelligence exercise in managing their own affairs, not in regard to speculation, but in regard to the permanent disposition of their own funds, considering the probable income as well as the probable safety of their capital.

*Id.* at 59-60 (read by Attorney Gillotti).[4]  When asked what might be considered a "proper investment," Attorney Gillotti explained that

> what has been determined over the years by [c]ourts in Pennsylvania as being reasonable investments for a trustee to make would be things like a savings account at a bank, a certificate of deposit at a bank, maybe high-grade corporate bonds in a really solid company.  Perhaps publicly traded stock of a company whose stock was not likely to decline in value.

*Id.* at 60.  Attorney Gillotti further testified that because Grandparents, the settlors of the Trust, were in their nineties, the trustee should consider low-risk investments.  *Id.*; *see also id.* at 61 (identifying investments in a closely-held company and certain types of stocks as high-risk investments).

Attorney Gillotti testified that he also supplied Appellant with a two-page informational memo about his duties as trustee.  *Id.* at 68.  According to Attorney Gillotti, the memo detailed the "most important provisions of in the [T]rust agreement," including the requirement that any distributions be approved by the distribution committee.  *Id.* at 69.

---

[4] A copy of the Trust Agreement was admitted into evidence as Commonwealth's Exhibit 1.  N.T., 10/30/23 (p.m.), at 47.  However, we note that **Appellant failed to include any of the trial exhibits in the certified record**.  It is well settled that "it is an appellant's duty to ensure that the certified record is complete for purposes of review."  *Commonwealth v. Lopez*, 57 A.3d 74, 82 (Pa. Super. 2012) (citation and brackets omitted).  Moreover, Appellant failed to include copies of any relevant trial exhibits in his reproduced record.  We thus set forth the language of the Trust Agreement as read into evidence, without objection, during Attorney Gillotti's testimony.  Appellant does not dispute the pertinent Trust language in his appellate brief.

**Grandparents' Death and Status of the Trust**

Michael Sr. passed away in 2016. Betty's health subsequently declined, and she passed away in 2018.

The trial court summarized Father's testimony concerning the events that next transpired:

> [Father] indicated that he understood that the death of both [Grandparents] would cause the [T]rust to terminate and its assets [to] be distributed to him and [Uncle], as beneficiaries. He further testified that in preparation for the termination of the Trust, he reached out to Appellant, as [t]rustee, to inquire as to the value of the Trust. [Father] testified that Appellant informed him that the value of the Trust was thirty-five dollars ($35.00).
>
> [Father] indicated that the $35.00 value shocked and upset him[,] as he expected the value to be approximately $210,000.00 because approximately $72,000.00 was distributed and used for the care of [Grandparents]. After learning this, [Father] reached out to Appellant to discuss what had transpired with the Trust funds/assets. [Father] stated th[at] when he asked Appellant where the funds had gone, Appellant did not provide a response. [Father] further testified that in December 2018, he learned that Appellant's business[5] had failed and was closed. [Father]

_____

[5] Pertinently, at some time prior to 2011, Appellant began working at Boston Seafood, a seafood wholesaler and retailer. When the original owner of Boston Seafood offered to sell the business to Appellant in 2011, Father co-signed a loan of approximately $13,000.00 to help Appellant purchase the business. *See* N.T., 10/30/23 (a.m.), at 26-27. Appellant changed the business's name to Boston Seafood Direct (sometimes hereinafter referred to as Appellant's business). *See id.* at 27-28. In 2013, Father invested approximately $200,000.00 into Boston Seafood Direct, from Father's retirement account and the sale of Grandparents' house. *See id.* at 30. Father took a 90% ownership interest in Boston Seafood Direct as a result of his investment. *See* N.T., 11/1/23 (p.m.), at 81, 87, 96. Father testified that he also "signed, through the years, with several banks, cosigns and lines of credit … amounting to about a hundred and twenty thousand [dollars]." *See* N.T., 10/30/23 (a.m.), at 30. Several years later, in 2017, Father and Appellant executed a
*(Footnote Continued Next Page)*

indic[a]ted that he requested that Appellant provide him a list of loans associated with Appellant's business[,] as he was concerned with any financial obligations imparted to him as part-owner of said business. [Father] testified that Appellant provided him a list, through e-mail, related to any loan involving [Father], in any way.

[Father] testified that included on that list was a loan from the … Trust to Boston Seafood Direct[,] stemming from December 2013 through 2014, totaling $140,000.00. [Father] stated that the information that Appellant provided him indicated that monthly payments of $1,000.00 were made on that debt beginning July 2017, which totaled $8,000.00, leaving an outstanding balance of $132,000.00. [Father] testified that the $140,000.00 loan distribution from the … Trust to Boston Seafood Direct was not one approved by the distribution committee[, *i.e.*, Father and Uncle].

*Id.* at 6-7 (footnote added; citations to record omitted).

### Appellant's Characterization of Trust Activity

Appellant testified at trial that, after becoming the Trust's trustee, he consulted his attorney, John Siejk, Esquire (Attorney Siejk), corporate counsel for Boston Seafood Direct. N.T., 11/1/23 (a.m.), at 79.[6] As a result of his

_____

purchase agreement whereby Father sold his ownership interest to Appellant. *See* N.T., 11/1/23 (p.m.), at 95-96. Also in 2017, Boston Seafood Direct's primary customer—which was responsible for approximately 30% of the company's total sales—went out of business. *See id.* at 121-22. Appellant then decided to "wind down" the business, and Boston Seafood Direct ultimately closed "right after New Years of 2018." *Id.* at 124-27.

[6] During trial, Appellant made several statements indicating that he consulted with Attorney Siejk after the Trust's formation, and sought his advice concerning use of the Trust funds for an investment in his business. *See* N.T. 11/1/23 (a.m.), at 74, 79-80, 105.

Relevantly, before the close of Appellant's testimony, the Commonwealth requested a missing witness instruction regarding Attorney
*(Footnote Continued Next Page)*

conversations with Attorney Siejk, Appellant "decided to make an investment into the business that [Father] owned 90 percent of and [Appellant] owned 10 percent of." ***Id.*** at 80; ***see also id.*** at 105 (Appellant describing transfers to his personal bank account as "a loan" from the Trust for his business).

The trial court detailed Appellant's testimony concerning his use of Trust assets:

> Appellant explained that when he began utilizing the Trust funds to invest in the business, he transferred the funds to his personal account and then from his personal account into the business accounts. He explained that in order to transfer funds from the Trust directly to his business accounts, E-Trade required a review of the Trust documents to ensure that he possessed the rights to do so. Appellant testified that he provided E-Trade with the required documentation and that some time in December 2013, E-Trade approved and allowed for the linking of Appellant's business accounts [with the Trust account] in [its] system. Appellant testified that pursuant to his review and understanding of the Trust document[,] he had sole discretion regarding investments of the Trust funds and was not prohibited from investing in a closely held business.
>
> Appellant testified [that] at the time he utilized the Trust funds to invest in his business, he believed such investments were prudent as the business, as a whole[,] was growing. Appellant [testified] that in April or May of 2017, the business's primary customer … shut down. He stated that the sales to [that customer] made up approximately $100,000.00 in monthly sales,

_____

Siejk. N.T., 11/3/23 (a.m.), at 3. The Commonwealth argued that despite Appellant's testimony that he consulted with Attorney Siejk prior to his investment of Trust funds, the Commonwealth had never heard his name before *voir dire*. ***Id.*** The Commonwealth also argued Attorney Siejk would be unavailable to the Commonwealth due to attorney-client privilege. ***Id.*** Appellant responded that Attorney Siejk was corporate counsel for Boston Seafood Direct, and thus, any privilege was to the corporation rather than Appellant. ***Id.*** at 4. After discussion, the trial court allowed the missing witness instruction. ***Id.*** at 5.

which translated to roughly $1.2 million per year in sales. Appellant testified that after suffering that loss of sales, the best course of action was to wind down the business. … [T]he business remained open until New Years Eve 2017. He stated that the income from the business, at that time, was utilized for payroll and reducing the business's outstanding debt. Appellant testified, as it related to the repayment of funds into the Trust account from his business, that the business received $8,500.00 [] in wholesale receivables after February 9, 2018.

Trial Court Opinion, 5/19/25, at 17-18 (brackets and citations to record omitted).

### Charges and Trial

Father testified that he felt shocked, disappointed, and betrayed when, following Betty's death, he learned that the balance of the Trust account was $35.00. N.T., 10/31/23 (a.m.), at 49. Father met with Appellant in May or June 2018 to discuss the status of the Trust. *Id.* at 50. Father testified as follows:

[W]hen [Appellant] sat down[,] I just said, "We got to do something about this. Payback." [Appellant said,] "I can't do it." I said, "just, like, five dollars for [Uncle] and myself per month, a gesture." "No." … And then [Appellant] said I was getting angry, and he doesn't want to talk to me because I'm angry.

*Id.*

Father later learned Appellant's business had closed, and Appellant supplied Father with a list of relevant loans. *See id.* at 53-55. Father noticed a loan with the following notation:

Trust Bernarsky Family loan to … Boston Seafood Direct (loaned to business December[] 2013 and through 2014)[.]

Guarantors: Boston Seafood Direct.

... Original balance: One hundred and forty thousand.

Monthly repayments: One thousand per month that began July of 2017.

Remaining balance: One hundred and thirty[-]two thousand (eight thousand paid back so far and those are the funds available in the [T]rust as of now.).

*Id.* at 55-56 (formatting modified). Because Father and Uncle had not approved a loan to Appellant's business, they met with Father's attorney to ask for advice. *See id.* at 57-58.

Ultimately, Father and Uncle asked their attorney to contact the Lackawanna County District Attorney's Office. *Id.* at 59. The criminal investigation division of the Lackawanna County District Attorney's Office conducted an investigation and filed a criminal complaint. Subsequently, on July 17, 2020, the Commonwealth charged Appellant, via criminal information, with the above-described offenses.

Prior to trial, the parties entered a stipulation as to the admissibility of certain bank and E-Trade account statements as certified domestic records of regularly conducted activity. *See* Pa.R.E. 902(11) (self-authenticating evidence); Pa.R.E. 803(6) (exceptions to the rule against hearsay – regardless of whether declarant is available).

On October 24, 2023, Appellant filed a motion *in limine* seeking preclusion of certain testimony at trial. In particular, Appellant sought to preclude 1) testimony by the prior owner of Boston Seafood concerning the

sale of the business to Appellant, and to certain other actions by Appellant; 2) testimony by Father that Appellant had undergone drug and alcohol treatment during high school; and 3) evidence concerning financial assistance—through gifts and loans—provided to Appellant by Father and Father's wife—Appellant's stepmother—Jeanne Casey-Bernarsky (Jeanne). Appellant argued such testimony would constitute prior bad acts evidence under Pa.R.E. 404(b), for which the Commonwealth had not provided the requisite notice.

The Commonwealth filed an answer, arguing 1) it did not intend to call the prior owner of Boston Seafood as a witness; 2) the fact of Appellant's prior addiction is relevant to the issue of Father and Appellant's prior estrangement, and was raised only as a result of cross-examination[7] by defense counsel; and 3) gifts and loans to Appellant from Father and Jeanne were not criminal actions, and thus did not constitute bad acts. The trial court heard oral arguments on the motion *in limine* prior to the start of trial. Following these

---

[7] Initially, Appellant waived his right to a jury trial and proceeded to a bench trial before the Honorable Andrew J. Jarbola, III. After the start of the bench trial, Judge Jarbola "realized [he] had independent information that would affect [his] ability to be fair and impartial." Order, 8/30/22. Judge Jarbola therefore granted a mistrial, recused himself from the case, and requested the reassignment of the case to another judge. *Id.* While Appellant averred in his motion *in limine* that he had reason to believe the Commonwealth intended to introduce addiction evidence based on provided discovery, the Commonwealth countered that it had instructed Father not to testify regarding Appellant's prior addiction. Rather, the Commonwealth argued Father's mention of Appellant's addiction during the bench trial was a response to defense counsel's cross-examination.

J-S35020-25

arguments, the trial court stated, "If [the Commonwealth] can prove it, fine."

N.T., 10/30/23 (Outstanding Motions and Jury Selection), at 14.[8]

Following additional pretrial proceedings not relevant to the instant appeal, the case proceeded to a jury trial. Father and Uncle testified against Appellant. The Commonwealth also introduced as witnesses, *inter alia*, Attorney Gillotti (offered as an expert in elder law and estate planning) and Arthur Moretti (Mr. Moretti) (offered as an expert in forensic accounting and certified public accounting).[9]

Relevantly, Attorney Gillotti testified that in his expert opinion, Appellant's transfers of Trust funds to himself, regardless of whether the

_____

[8] The trial court never entered an order expressly denying Appellant's motion *in limine*.

[9] Pertinently, during cross examination of Father, Appellant introduced Boston Seafood Direct's income tax filings for 2013, 2014, and 2015. **See** N.T., 10/31/23 (p.m.), at 19-22. Mr. Moretti later testified that those exhibits were incomplete, as they failed to include various schedules. **See** N.T., 11/1/23 (a.m.), at 81; **see also id.** at 82 (Mr. Moretti testifying there was no way to confirm whether the tax returns provided as exhibits were filed with the Internal Revenue Service).

Before the close of trial, the Commonwealth requested a missing document instruction concerning the incomplete tax returns. **See** N.T., 11/3/23 (a.m.), at 6. Appellant argued to the contrary that Father had the same access to the corporate tax returns due to his status as a 90% owner of Boston Seafood Direct. **Id.** During the parties' discussions, the trial court noted its concern that the documents were never verified. **Id.** at 8. Ultimately, the trial court issued the missing document instruction.

- 12 -

transfers ultimately went into Appellant's business, were improper. N.T., 10/30/23 (p.m.), at 72. Attorney Gillotti testified as follows:

> It violates at least three duties that a trustee has. If you are a trustee of a trust, you have a duty of care to perform your duties in a way that is prudent. You have a duty of loyalty[;]… the interest of the beneficiaries of the trust … become paramount. And you have a duty to avoid self[-]dealing. That is to say your role as trustee to … enter into a transaction with yourself on the receiving end. So it was improper because it was a breach of those duties….

*Id.* at 73. Additionally, Attorney Gillotti opined that Appellant's investment in his own closely-held business was inappropriate. *Id.*

Mr. Moretti completed an expert report, which was admitted into evidence as Commonwealth's Exhibit 10.[10] Mr. Moretti testified that he reviewed the activity in the Trust account "from the moment it's funded until the last date of which I have records available, which was December 31[], 2018." N.T., 11/1/23 (a.m.), at 53. Mr. Moretti also reviewed the Trust agreement itself. *Id.* at 55-57 (describing the Trust as "very conservative" and explaining the Trust language helps him evaluate whether transactions should be considered regular or irregular); *see also id.* at 57 (stating, "[T]he language of the [T]rust was very conservative as I read it. And the

---

[10] We note, again, that Mr. Moretti's expert report (and any included documents he used during his review, including the Trust account documents) are not included in either the certified or reproduced records. *Lopez*, 57 A.3d at 82. Therefore, our summation of Mr. Moretti's expert opinion is limited to his testimony at trial, including his testimonial references to his report.

investments should probably have followed the same level of conservative pattern.").

Mr. Moretti testified that the Trust account was funded on November 6, 2013, with a starting balance of $252,660.00. *Id.* at 62-63. Mr. Moretti identified several accounts associated with Appellant to which Trust funds were distributed:

- Appellant's personal account at NBT Bank: $138,000.00 (gross withdrawn from the Trust account) - $1,000.00 (returned to the Trust account from Appellant's personal account) = $137,000.00 net withdrawn

- BSD, Inc.[11]: $88,078.00 (gross withdrawn from the Trust account) - $62,500.00 (returned to the Trust account from BSD, Inc.) = $25,578.00 net withdrawn

- Boston Seafood Direct: $8,700.00 net withdrawn[12]

- Appellant's personal E-Trade account: $24,725.00 (gross withdrawn from the Trust account) - $3,288.47 (returned to the Trust account from Appellant's personal E-Trade account) = $21,436.53 net withdrawn

---

[11] "BSD, Inc." is the designation associated with one of the accounts for which Appellant is a signatory. N.T. 11/1/23 (a.m.), at 65. Presumably, the account is related to Boston Seafood Direct. *Id.* (Mr. Moretti stating, "My understanding is that's a company. I don't know if it's currently running.").

[12] Mr. Moretti testified that a gross of $15,000.00 was transferred from the Trust account to Boston Seafood Direct's account. N.T., 11/1/23 (a.m.), at 67. While he did not specifically testify to the amount repaid, keeping in mind the net withdraw of $8,700.00, it appears $6,300.00 was repaid to the Trust account from Boston Seafood Direct.

***See id.*** at 63-68. Mr. Moretti also testified that a check or checks totaling $600.00 "came into the [T]rust from Mr. Cindy's Seafood."[13] ***Id.*** at 68. Additionally, Mr. Moretti explained that additional margin interest and fees were incurred on the Trust account.[14] ***Id.*** at 68. He testified that because

_____

[13] During his testimony, Mr. Moretti stated he assumed Mr. Cindy's Seafood was a company owned by Appellant. N.T., 11/1/23 (a.m.), at 68. Appellant referenced Mr. Cindy's Seafood as an entity operated by the prior owner of Boston Seafood. ***See*** N.T., 11/1/23 (p.m.), at 92. From the record, it is unclear whether Appellant assumed ownership of Mr. Cindy's Seafood at the time he purchased Boston Seafood.

[14] Mr. Moretti explained margins as follows:

> Whenever you set up an account that's not encumbered by an individual retirement account, or some special child's account, you're allowed to margin it. And what that means is you can take -- if you put [$100,000.00] into an account, and you put it into stock, the brokerage firm will allow you to borrow against that [$100,000.00]. So what they'll do is they will give you a line of credit for [$50,000.00] that you can use any way you want. If you don't use it, you don't pay any interest or fees. But if you do use it, just like any other loan, even though you're borrowing from yourself, you're still borrowing, and you have to pay interest and fees. … Margin allows you to take an account and use borrowed money to invest further. That's usually the purpose, to invest that money. If you're going to pay [5%] interest on the margin account, you're hoping that you'll make [6%] or greater if you invest that money. Margin accounts are used by usually sophisticated investors.
>
> ….
>
> … The margin account … is a leverage against your securities that you have. And the purpose of it is generally to use that money to invest in a hope that the return on your investment with that borrowed money will exceed the interest that you're paying … to borrow it. … And this is a real danger with margin accounts.

*(Footnote Continued Next Page)*

the margin was used so often, "there was a lot of interest generated and insufficient fund fees. The [T]rust account was littered with balances that would fall into the negatives until such time as small amounts of cash were deposited into the account." *Id.* at 73.

Mr. Moretti explained that some income came into the Trust account through stock dividends. *Id.* Mr. Moretti acknowledged some distributions to the beneficiaries, and characterized those distributions as "regular." *Id.* at 79, 87.

Additionally, Mr. Moretti testified that his forensic accounting revealed that Appellant engaged in day trading. *Id.* at 73-74; *see also id.* at 74 ("[Appellant] was buying and selling stock within the same period of time within the same day."). According to Mr. Moretti, Appellant used the "very risky process" of buying and selling puts and calls.[15]

_____

N.T., 11/1/23 (a.m.), at 69-70 (some paragraph breaks omitted). According to Mr. Moretti, the Trust account "was margined from the get-go." *Id.* at 71. The margined money was then transferred into the above-described accounts. *See id.* at 71-72.

[15] Puts and calls are types of options trading, which Mr. Moretti explained as follows:

> A put is a term, [for example,] if I think IBM stock is going to go down from today, I can … buy it at whatever the price is, and sell it at today's price four months from now, that's called a put. That's when you expect the price to go down. You're betting. You're gambling. You are gambling when … you buy a put that an individual security is going to lose value in the short-term. …

*(Footnote Continued Next Page)*

Based on his forensic accounting, Mr. Moretti testified that a gross of $265,803.00 was withdrawn from the Trust account. *Id.* at 76. Mr. Moretti also opined it was appropriate to add the accrued margin interest and fees because "had the money not been moved out, it would have been available to cover all of that stuff. This was a choice that was made to margin the account, and this was interest incurred because of it." *Id.*

In sum, Mr. Moretti provided the following expert opinion, to a reasonable degree of professional certainty:

> [M]y opinion is that [Appellant] initiated transactions of [$265,803.00] that removed money from the [] Trust to individual bank accounts of which he was in control. Most of it went to his personal bank accounts, but … there was some money still out there that went into some of the businesses.
>
> My opinion is that the [$8,708.27] in margin fees and insufficient fund fees, it would be absurd to believe … that the trustee was not responsible for incurring that because of the actions that [Appellant] took. And [Appellant] did repay [] at various times, although not in any pattern or manner that I could see, [$74,188.47].
>
> It's my opinion that the irregular activity is all [$274,511.27] that went from the [T]rust to these accounts. And the reason I'm not crediting [Appellant] with payback of it is because the irregular activity was the action that sent it from the [T]rust to his personal account in the first place. … It went to

---

A call is you're betting on the price over a short period of time increasing. So if you see a price that's kind of low, and you think you know about the stock, … you're going to buy it today at today's price, and … you're selling at a later date because you're betting … that the price of the stock will go up.

N.T., 11/1/23 (a.m.), at 74-75.

[Appellant]. It went to [Appellant's] accounts from the [T]rust, and, therefore I believe all [$274,511.27] was money he diverted from the [T]rust to his own accounts.

… [T]here's an opportunity that was lost. … Had the Proctor & Gamble [stock] stayed [in the Trust,] there would have been another quarter of a million dollars … that this account would have earned. It didn't earn it because the money wasn't there to put into it. It was recklessly utilized….

*Id.* at 85-87.

On November 3, 2023, a jury convicted Appellant of the above-described offenses. The verdict slip included an interrogatory under each theft conviction for which the jury could render a finding as to the amount taken. For each conviction, the jury found the amount taken by Appellant was "Between $100,000 but less than $500,000." Additionally, concerning Appellant's theft by deception – false impression and theft by deception – failure to correct convictions, the jury found the victim of the crime was over the age of 60. In finding Appellant guilty of misapplication of entrusted property, the jury also entered a finding that the amount exceeded $50 (increasing the offense grading to a second-degree misdemeanor).

On January 30, 2024, the trial court sentenced Appellant to 12 to 36 months in prison for his theft by unlawful taking conviction. The remaining theft convictions merged for sentencing purposes. For his misapplication of entrusted property conviction, the trial court sentenced Appellant to a consecutive term of 2 years' probation. Further, the court ordered Appellant

to pay $201,468.51 in restitution and costs.[16]  The restitution was ordered to be divided evenly between Father and Uncle.

On February 2, 2024, Appellant filed a motion for bail pending appeal. The Commonwealth filed a response to Appellant's request for bail. Ultimately, following a hearing, the trial court denied Appellant's motion for bail pending appeal.

Additionally, on February 7, 2024, Appellant filed a timely post-sentence motion challenging the sufficiency and weight of the evidence supporting his convictions, the propriety of the jury instruction regarding Appellant's failure to present documents, the amount of restitution imposed, and the discretionary aspects of his sentence.  The Commonwealth filed a response.

The trial court conducted a hearing on Appellant's post-sentence motion on March 12, 2024.[17]  The court did not render a decision on the post-sentence motion at that time.  On June 3, 2024, Appellant filed a motion for extension

---

[16] The total of $201,468.51 reflects the $200,322.76 in restitution, plus $1,085.75 in costs, plus a $60.00 payment to the Crime Victim's Compensation Fund.

[17] At the conclusion of this hearing, the trial court granted trial counsel's motion to withdraw from representation, as Appellant had retained new counsel.

of time for the trial court to decide the post-sentence motion.[18, 19] ***See***
Pa.R.Crim.P. 720(B)(3)(b) ("Upon motion of the defendant within the 120-day
disposition period, for good cause shown, the judge may grant one 30-day
extension for decision on the motion. If the judge fails to decide the motion
within the 30-day extension period, the motion shall be deemed denied by
operation of law."). The trial court granted Appellant's motion, noting that it
previously had scheduled a hearing on Appellant's post-sentence motion for
June 24, 2024.

During the June 24, 2024, hearing, Appellant pointed out that the
sentencing order did not indicate whether he was eligible for a minimum
sentence under the Recidivism Risk Reduction Incentive (RRRI) program, ***see***
61 Pa.C.S.A. §§ 4501-4512. On the same date, the trial court entered an
order granting Appellant's post-sentence motion in part and vacating his
judgment of sentence. The following day, the trial court modified the
sentencing order to specify an RRRI minimum sentence of 9 months.

_____

[18] Without the grant of additional time, the 120-day period for deciding the post-sentence motion would expire on June 6, 2024.

[19] We note that this motion is not included in the certified record. However, the trial court acknowledged its filing.

On July 14, 2024, Appellant filed a notice of appeal.[20] Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant now raises the following issues for review:

1. Was the evidence insufficient to support the convictions for theft by unlawful taking, theft by failure to make required disposition of funds received, theft by deception – false impression, theft by deception – failure to correct, and misapplication of entrusted property[,] where [the Commonwealth witnesses'] testimony was so inconsistent and incredible that it could not support a finding of guilt beyond a reasonable doubt?

_____

[20] On September 13, 2024, this Court issued a rule to show cause why the June 24, 2024, and June 25, 2024, orders should not be vacated as legal nullities. Rule to Show Cause, 9/13/24, at 2 (stating the order granting an extension of time for decision on the post-sentence motion was docketed on June 10, 2024, four days after the motion should have been denied by operation of law). In response, the trial court argued the order was issued on June 6, 2024 (the final day of the 120-day disposition period) rather than on June 10, 2024. The trial court described the docketing delay as a "clerical/administrative error." Response to Rule to Show Cause, 9/23/24, at 2 (unnumbered). The court also attached to its response a copy of an email, dated June 6, 2024, from the trial court's law clerk to the parties, which included, as an attachment, the order granting Appellant's motion for extension of time. Subsequently, this Court discharged the rule to show cause and deferred the issue to the merits panel.

From our review of the trial court's response and attachment, it is clear the trial court and parties shared an understanding that the order granting an extension of time was entered as of June 6, 2024, the final day over which the court could exercise jurisdiction over the motion. Though the order was not docketed until June 10, 2024, the delay can be attributed to a breakdown in court operations. Thus, we decline to quash the appeal. *See generally Commonwealth v. Rodriguez*, 174 A.3d 1130, 1138-39 (Pa. Super. 2017) (declining to quash untimely appeal due to a breakdown in court operations, where the clerk of courts prematurely deemed the appellant's post-sentence motion to be denied by operation of law, and upon a second filing by the appellant for an extension of time, the clerk of courts failed to provide notice that the motion was denied by operation of law).

2. Was the verdict against the weight of the evidence[,] where [the Commonwealth witnesses'] testimony was so inconsistent and unreliable that it shocked the conscience?

3. Did the trial court err in admitting testimony regarding Appellant's history of drug and alcohol abuse, monetary gifts/loans from [Father] to Appellant for business ventures[,] and a $300,000 loan from Jeanne … to Appellant[,] where such evidence was irrelevant (Pa.R.E. 401), unfairly prejudicial (Pa.R.E. 403), and improper prior bad acts evidence without notice (Pa.R.E. 404(b))?

4. Did the trial court err in issuing a jury instruction on the defense's failure to call Attorney [] Siejk as a witness[,] and on the defense's failure to produce complete income tax returns[,] where the factors for a missing witness/missing document instruction were not met?

5. Did the trial court err in ordering restitution in the amount of $200,322.77[,] where it failed to account for funds already distributed to the beneficiaries?

Appellant's Brief at 6-7.

In his first claim, Appellant challenges the sufficiency of the evidence supporting each of his convictions. As to each of his convictions, Appellant contends the Commonwealth failed to establish he had the specific intent to commit the offenses. *See id.* at 18-21. Appellant argues, to the contrary, that the evidence established his intent to benefit the Trust through investment in his business. *Id.* at 21. According to Appellant, "[t]here was never any personal enrichment." *Id.* at 22. Appellant emphasizes that he consulted with Attorney Siejk regarding the propriety of investing Trust funds into Boston Seafood Direct. *Id.* Appellant also points out that he made

investments in the business, over which Father held a 90% ownership interest. *Id.* at 23.

Regarding his misapplication of entrusted property conviction, Appellant asserts the Commonwealth did not establish his investments involved a substantial risk of loss, because Appellant's business was profitable at the time he made the investments. *Id.* at 23. Additionally, Appellant alleges he 1) made good faith efforts to repay the Trust; 2) made authorized distributions to Father and Uncle; and 3) provided funds for Grandparents' care from the Trust assets without difficulty. *Id.* at 24.[21, 22]

Further, Appellant claims the Commonwealth failed to prove Appellant committed the crimes of theft by deception:

---

[21] We observe that Appellant's argument includes citations only to our standard of review for sufficiency claims and to the statutory language of the crimes for which he was convicted. Appellant has otherwise cited no caselaw to support his argument. *See* Pa.R.A.P. 2119(a) (providing that the argument shall include "such discussion and citation of authorities as are deemed pertinent.").

[22] Appellant also avers that Father's testimony "was riddled with inconsistencies on critical facts." Appellant's Brief at 25. To the extent Appellant challenges the credibility of Father's trial testimony, such a claim properly goes to the weight, rather than sufficiency, of the evidence. *See Commonwealth v. Wilson*, 825 A.2d 710, 713-14 (Pa. Super. 2003) (explaining that a challenge to the sufficiency of evidence "does not include an assessment of the credibility of the testimony offered by the Commonwealth. Such a claim is more properly characterized as a weight of the evidence challenge.") (citation omitted). *But see Commonwealth v. Brown*, 52 A.3d 1139, 1157 n. 18 (Pa. 2012) (recognizing that a verdict may be reversed as insufficient in "extreme situations where witness testimony is so inherently unreliable and contradictory that it makes the jury's choice to believe that evidence an exercise of pure conjecture").

> For the theft by deception charges, the Commonwealth was required to prove that Appellant created or reinforced a false impression. However, the evidence established no communication. The uncontradicted evidence showed there was no communication between Appellant and the beneficiaries regarding [T]rust investments or performance. … Because there were no discussions about [T]rust performance, Appellant could not have created any false impressions about the value or success of [T]rust investments. … The beneficiaries never requested an accounting or inquired about [T]rust performance during Appellant's tenure. The absence of communication precludes any finding of deception.

*Id.* at 25 (citations to record omitted).

"Because sufficiency of the evidence is a question of law, the standard of review is *de novo*, and the scope of review is plenary." ***Commonwealth v. Coniker***, 290 A.3d 725, 733 (Pa. Super. 2023) (citation omitted).

> The standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Furness***, 153 A.3d 397, 401 (Pa. Super. 2016) (citation and brackets omitted).

The Crimes Code defines theft by unlawful taking as follows:

**§ 3921. Theft by unlawful taking or disposition**

**(a) Movable property.--**A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

18 Pa.C.S.A. § 3921(a). "[T]o convict a defendant of theft by unlawful taking, the Commonwealth must establish three elements: (1) unlawful taking or unlawful control over movable property; (2) ownership of another person of the movable property; and (3) intent to deprive permanently." *Commonwealth v. Carter*, 332 A.3d 867, 674 (Pa. Super. 2025).

Appellant was also convicted of two counts of theft by deception, which is defined, in relevant part, as follows:

**§ 3922. Theft by deception**

**(a) Offense defined.--**A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

* * *

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

18 Pa.C.S.A. § 3922(a)(1), (3). This Court has explained that criminal intent may be "inferred from acts or conduct or the attendant circumstances."

*Commonwealth v. Gaspard*, 323 A.3d 1276, 1279 (Pa. Super. 2024)

(citation omitted).

The Crimes Code defines theft by failure to make required disposition of

funds received as follows:

> **§ 3927. Theft by failure to make required disposition of funds received**
>
> **(a) Offense defined.--**A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

18 Pa.C.S.A. § 3927(a). "In short, [section 3927] criminalizes the act of failing

to properly distribute another's property in accordance with either an

agreement or legal obligation." *Commonwealth v. Goodco Mech., Inc.*,

291 A.3d 378, 392 (Pa. Super. 2023).

> Regarding the proof required, we have explained that the defendant may have failed to adhere to either an agreement or a preexisting legal obligation. We established that the element requiring the defendant to "deal" with the other's property as his own means only that the actor must have treated the other's property as if it were his own; it does not require the defendant to have used the property. Finally, although the Commonwealth must prove the defendant "intentionally" dealt with the property as his own, the remaining elements are satisfied if the Commonwealth proves the defendant acted intentionally, knowingly, or recklessly.

*Id.* at 393 (internal citations omitted).

Finally, misapplication of entrusted property is defined as follows:

**§ 4113. Misapplication of entrusted property and property of government or financial institutions**

**(a) Offense defined.--**A person commits an offense if he applies or disposes of property that has been entrusted to him as a fiduciary … in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted.

18 Pa.C.S.A. § 4113(a).[23]   "The only pertinent inquiry is whether [the defendant] disposes of entrusted property in a manner that he knows is unlawful and involves a substantial risk of loss or detriment to the owner of the property." ***Commonwealth v. McCullough***, 230 A.3d 1146, 1177 (Pa. Super. 2020).  Additionally, the defendant's "intent to 'replace' the property in the future is irrelevant." ***Id.***

Instantly, Appellant argues only that the Commonwealth failed to prove his *intent* to commit each of the crimes for which he was convicted.  The trial court rejected Appellant's sufficiency challenge, relying on the reasoning it set forth in addressing Appellant's weight challenge (which we quote in full, *infra*). ***See*** Trial Court Opinion, 3/19/25, at 19-22, 23-27.  Upon review, we agree that the evidence presented at trial, viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to support each of Appellant's convictions.

---

[23] Appellant does not dispute his status as a fiduciary.

Appellant's attempt to characterize his actions as reasonable and well-intentioned, albeit failed, business investments[24] ignores the most critical fact of this case—beginning the day after the Trust was funded, Appellant diverted funds from the Trust without the unanimous approval of the distribution committee. Appellant acknowledges that he attended the meeting with Attorney Gillotti, Father, and Uncle to execute the Trust. N.T., 11/1/23 (p.m.), at 72. Appellant also remembered receiving a copy of the Trust agreement, as well as the informational memo that Attorney Gillotti supplied, which detailed the key provisions of the Trust. *Id.* at 73, 75; *see also id.* at 116 (Appellant acknowledging he had several occasions to review the Trust agreement). Notably, Appellant confirmed his understanding that the Trust agreement required the distribution committee to approve any distributions of principal. *Id.* at 76.

Nevertheless, between the Trust's creation in 2013 and Betty's death in 2018, Appellant **knowingly and repeatedly** distributed Trust principal to his personal bank account, his personal E-Trade account, and various business

---

[24] Though Appellant describes the distribution of Trust funds to his personal and business accounts as both "investments" and "loans," we note that investments and loans are distinct terms. *Compare* Investment, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining an "investment" as, *inter alia*, "[a]n expenditure to acquire property or assets to produce revenue; a capital outlay.") **with** Loan, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "loan" as "1. An act of lending; a grant of something for temporary use…. 2. A thing lent for the borrower's temporary use; esp., a sum of money lent at interest…").

accounts. All such distributions were made **without the approval of the distribution committee**, *i.e.*, Father and Uncle, as specifically required by the Trust agreement. At no time during the approximately five years of Appellant's tenure as trustee did Appellant inform Father and Uncle of his "investments" or "loans," or the dwindling balance of the Trust principal resulting therefrom.

Additionally, the jury heard testimony (detailed *supra*) from the Commonwealth's experts, Attorney Gillotti and Mr. Moretti, concerning Appellant's duties as Trustee and his actions in managing Trust assets. In particular, Attorney Gillotti opined that Appellant's actions violated the core duties of a trustee. **See** N.T., 10/30/23 (p.m.), at 72-73. Further, Mr. Moretti, after completing forensic accounting, detailed the "irregular activity" found in the Trust account, including a pattern of high-risk investment and stock trading, which resulted in the incursion of margin interest and fees. **See** N.T., 11/1/23 (a.m.), at 53-87. From the verdict, it is clear the jury credited the experts' testimony, as was within its sole province as the finder of fact. **See** **Furness**, 153 A.3d at 401.

From the attendant circumstances, we conclude the evidence sufficiently established that over the course of approximately five years, Appellant, using his status as trustee, intentionally diverted funds from the Trust principal into his own business venture and personal accounts, knowing that he was not entitled to do so without the approval of both Father and Uncle. The evidence

therefore supports the finding that Appellant acted with the specific intent necessary to support his convictions. *See, e.g.*, *Gaspard*, 323 A.3d at 1280 (concluding evidence was sufficient to support the defendant's conviction for theft by deception in connection with her recertification for county housing benefits, where the recertification the defendant signed required her to report any changes in income, regardless of the source; the defendant failed to disclose self-employment income; and the county housing authority relied on the defendant's disclosures in awarding benefits); *Commonwealth v. Gorman*, 182 A.3d 1035, 1043-46 (Pa. Super. 2018) (concluding evidence was sufficient to support the defendant's convictions of theft by unlawful taking, receiving stolen property, and misapplication of entrusted property, where the defendant mishandled and misused donations made to the Military Veterans Honor Guard, which he operated; defendant disregarded the Veterans of Foreign Wars Post bylaws concerning the handling of funds and disbursements; defendant ignored multiple cautions that any donated money was not his personal property; defendant knowingly disregarded bylaws requiring membership approval for disbursements; and defendant used donations to pay for personal expenses).

Moreover, concerning Appellant's misapplication of entrusted property conviction, we reiterate that a fiduciary's intent to replace (or actual replacement of) previously disposed-of property, is irrelevant. *See McCullough*, 230 A.3d at 1177. Indeed, the theft and misappropriation

occurred at the time Appellant diverted Trust principal into his personal and business accounts. *See id.* By diverting the Trust funds, Appellant "caused an actual, not [] merely a risk of, loss to" the Trust and its beneficiaries. *See id.* (concluding the defendant/attorney—who exercised control over the victim's property through an invalid power of attorney—caused an actual loss to the victim and committed misapplication of entrusted property at the time he issued checks from the victim's trust, notwithstanding the later return of those checks). Accordingly, Appellant's sufficiency claims lack merit.

In his second claim, Appellant argues the verdicts were against the weight of the evidence. *See* Appellant's Brief at 26-29. According to Appellant, "[t]he trial court failed to properly weigh the overwhelming evidence that Appellant's conduct constituted legitimate business investment[.]" *Id.* at 27. Appellant asserts that because his business was initially successful, the fact-finder could not infer that he made the investments with knowledge that they would impose a substantial risk. *Id.* Appellant also points out that he provided authorized distributions to Father and Uncle to use for Grandparents' care. *Id.* at 28. Appellant faults the trial court's finding that the Commonwealth witnesses were credible. *Id.*

A weight of the evidence claim is addressed to the discretion of the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an

- 31 -

appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Bright*, 234 A.3d 744, 749 (Pa. Super. 2020) (citation omitted). "In order for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Smith*, 146 A.3d 257, 265 (Pa. Super. 2016) (citation omitted). Additionally, "this Court cannot substitute its credibility determinations for that of the factfinder or reweigh the evidence." *Commonwealth v. Salinas*, 307 A.3d 790, 795 (Pa. Super. 2023). Indeed,

when the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on direct review.

*Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa. Super. 2009).

Instantly, the trial court rejected Appellant's challenge to the weight of the evidence, reasoning as follows:

[T]he evidence presented at trial leading to Appellant's guilty verdict[s] do[] not shock one's sense of justice so as to require the grant of a new trial. The record supports the jury's finding of guilt. In this case, the Commonwealth presented five (5) witnesses.

During trial, the jury heard from [Father], who provided detailed testimony regarding the formation of the … Trust, and the reasons for its creation. [Father] additionally provided testimony explaining how and why Appellant was chosen as trustee…. His testimony provided information that indicated that[, as trustee, Appellant] had access to the funds contained in the … Trust, which Appellant utilized to invest, without authorization, in a business that Appellant owned and operated. [T]hat business ultimately failed, causing the investment from the … Trust to be lost, which in turn hastened the depletion of the [T]rust assets.

Additionally, [Uncle], in the same vein, testified regarding the creation of the … Trust and appointment of Appellant as its trustee. [Uncle] testified that he managed the joint bank account between h[im] and [Father] that was used to pay any expenses associated with the care of [Grandparents]. [Uncle] testified that if he needed funds from the Trust in order to pay for expenses for [Grandparents'] care, he contacted Appellant and requested the funds. [Uncle] stated that he never had any difficulty obtaining the funds from the Trust through Appellant. [Uncle] was not aware of the depletion of the Trust assets until after [Betty's] funeral, when [Father] informed him of what took place.

Attorney Gillotti testified in relation to the creation of the Trust, his involvement in its creation, and his explanation of the contents of the Trust document to the beneficiaries[, *i.e.*, Father and Uncle,] and Appellant as trustee. Attorney Gillotti indicated that [Grandparents] were the settlors of the Trust, with [Father] and [Uncle] as named beneficiaries, and Appellant as trustee. Attorney Gillotti indicated that the Trust was funded by the transfer of three thousand (3,000) shares of stock of the Proctor & Gamble Company. He further explained the powers and duties of each party[,] including those of Appellant as trustee.

Attorney Gillotti explained to the jury that if Appellant, as trustee, wanted to make a distribution, he would have to get the consent of [Father] and [Uncle], the distribution committee. [Attorney Gillotti] also explained that pursuant to the provisions of the Trust, Appellant could not have distributed money to himself without the written approval of the distribution committee.

When the Commonwealth inquired of Attorney Gillotti, as an expert in elder law and estate planning, as to whether he rendered an expert opinion as to the propriety of Appellant's transactions

into Appellant's personal and business accounts, he testified that the transfer of money out of the [T]rust by Appellant as trustee to himself, even if it went into his business, was totally improper because it was a breach of the duty of care, the duty of loyalty, and the duty to avoid self[-]dealing.

Moreover, [Mr.] Moretti[] testified as an expert witness in the field of forensic accounting and certified public accounting. Mr. Moretti testified that upon completing the forensic accounting, he noted that the [T]rust had a lot of irregular activity, and indicated that almost all but the distributions to the beneficiaries he considered irregular. Mr. Moretti testified that at the outset of the formation and funding of the Trust, Appellant began transferring funds from the Trust and into his personal bank account at NBT Bank. Mr. Moretti provided testimony that demonstrated that Appellant transferred a net amount of $137,000.00 from the Trust to his personal NBT Bank account.

Further, Mr. Moretti testified that pursuant to his forensic accounting, he determined that Appellant transferred a net amount of $21,436.53 from the Trust account to his personal E-Trade account. Additionally, Mr. Moretti testified that Appellant transferred a net amount of $25,578.00 from the Trust account to BSD, Inc. [H]e further testified that Appellant transferred a net amount of $8,700.00 from the Trust account to the Franklin Security Bank account associated with Boston Seafood Direct… [, t]hereby creating a net amount of $191,614.50 that Appellant transferred from the Trust to his personal and/or business accounts. With the addition of margin fees and interest, … Appellant withdrew a net total of $200,322.77 from the Trust, which was not reimbursed.

[The trial c]ourt found that the Commonwealth's witnesses provided testimony that was credible and reliable enough to allow the jury to return a verdict of guilty on all of the offenses charged against Appellant. …

Trial Court Opinion, 3/19/25, at 23-26 (internal citations, quotation marks, and some brackets omitted).

Upon review, we discern no abuse of the trial court's discretion in rejecting Appellant's weight claim. From the verdicts, it is clear the jury

credited the testimony of the Commonwealth's witnesses. "It is not for this Court to overturn the credibility determinations of the fact-finder." *Commonwealth v. Blackham*, 909 A.2d 315, 320 (Pa. Super. 2006); *see also Salinas*, 307 A.3d at 795. The verdicts are not so contrary to the evidence as to shock the conscience. Thus, the trial court properly denied Appellant's weight of the evidence claim.

In his third claim, Appellant contends the trial court improperly admitted testimony concerning his history of drug and alcohol abuse, as well as testimony concerning monetary gifts and loans from Father, and a loan from Jeanne. Appellant's Brief at 29. Appellant argues his prior drug and alcohol abuse, which occurred approximately 15-20 years prior to the charged conduct, was irrelevant to his management of the Trust. *Id.* at 30-31. Appellant also claims this testimony was unfairly prejudicial because "[e]vidence of substance abuse creates a powerful inference that Appellant might have used [T]rust funds to support addiction…." *Id.* at 31.

Similarly, Appellant asserts evidence concerning financial gifts and loans he received from Father and Jeanne were not relevant to the issue of whether he criminally misappropriated Trust funds. *Id.* at 31-32. According to Appellant, testimony about these gifts and loans was unfairly prejudicial and "created the false impression that Appellant was financially irresponsible and dependent on family support, leading to an improper character inference that he would steal [T]rust funds." *Id.* at 32. Further, Appellant claims both

categories of testimony constituted Pa.R.E. 404(b) bad acts evidence, for which the Commonwealth did not provide notice. Appellant's Brief at 30-31, 33.

> We employ a deferential standard of review for evidentiary issues:
>
> The admission of evidence is committed to the sound discretion of the trial court, and the trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Dodd*, 339 A.3d 514, 517 (Pa. Super. 2025) (citation omitted).

"Relevance is the threshold for admissibility of evidence." *Commonwealth v. Lowmiller*, 257 A.3d 758, 763 (Pa. Super. 2021). Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence[,] and (b) the fact is of consequence in determining the action." Pa.R.E. 401; *see also Lowmiller*, 257 A.3d at 763 (stating that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." (citation omitted)). "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "The court may exclude evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Further, regarding "bad acts" evidence, Rule 404(b) provides as follows:

**Rule 404. Character Evidence; Other Crimes, Wrongs, or Acts**

\* \* \*

**(b) Other Crimes, Wrongs, or Acts**

(1) *Prohibited Uses.* Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

(3) *Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable written notice in advance of trial so that the defendant has a fair opportunity to meet it, or during trial if the court excuses pretrial notice on good cause shown, of the specific nature, permitted use, and reasoning for the use of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b).

As we have explained,

[e]vidence of prior [bad acts] is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes. Nevertheless, evidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character. Specifically, other [bad acts] evidence is admissible if offered for a non-propensity purpose such as proof

of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. When offered for a legitimate purpose, evidence of prior [bad acts] is admissible if its probative value outweighs its potential for unfair prejudice.

*Lowmiller*, 257 A.3d at 763 (internal citations and quotation marks omitted).

Here, the trial court addressed Appellant's evidentiary claims as follows:

In regard to Appellant's claim concerning the admission of testimony of Appellant's history of drug and/or alcohol abuse, th[e trial c]ourt allowed [Father's] testimony on that subject[,] as it portrayed the history of the relationship between Appellant and [Father]. That is, Appellant and [Father] had multiple estrangements where the two did not speak for many years at a time. The first occurred when Appellant was a child[,] due to the separation of [Father] and [Ms. Scarpetta]. The second, the issue at hand, occurred approximately at a time when Appellant was in high school. Here, during direct examination, [Father], when asked by the Commonwealth, explained that he learned that Appellant became involved with the use of alcohol and drugs. After learning that, [Father] arranged for Appellant's admission into [a] rehabilitation facility and transported Appellant to that facility. [Father] indicated that after that took place, it seemed like Appellant had an anger towards him[,] and [] he and Appellant did not communicate for roughly eight (8) years.

It was after this eight (8) year period that Appellant and [Father] reconciled their relationship. Upon doing so, [Father] learned that Appellant enrolled in a program with Morgan Stanley and worked towards obtaining a license to be able to trade stocks. Although that endeavor did not work out for Appellant, it was at that time that [Father] learned Appellant became involved in the seafood business. All of which led to Appellant becoming involved as the trustee for the Trust at issue.

As it relates to Appellant's challenge … concerning loans made to Appellant as investments [] or to be utilized as business capital, th[e trial c]ourt found that the Commonwealth did not offer such evidence as a prior bad act pursuant to Pennsylvania Rule of Evidence 404. Rather, the Commonwealth indicated that such evidence was offered in support of a letter that Appellant sent to [Father], wherein Appellant acknowledged the existence of the loans that [Father] and Jeanne advanced to Appellant. The

Commonwealth introduced that particular letter through [Father's] testimony[,] wherein he read said letter into the record. The letter was dated March 23, 2020, at a time after [Betty] departed this life, the depletion of the Trust funds, and when criminal charges were pending against him. The letter contained information demonstrating Appellant's acknowledgement of the loans in question and his desire to make financial restitution. Moreover, the introduction of the testimonial evidence that Appellant now challenges was offered to support information contained in an e-mail from Appellant to [Father], in which Appellant listed the accounts and loans made to Boston Seafood Direct that involved [Father] in any manner.[25]

Thus, … th[e trial c]ourt found that the Commonwealth did not offer the challenged evidence as prior bad acts under Pennsylvania Rule of Evidence 404. Additionally, th[e trial c]ourt found that such information [was] relevant to the issue at hand and served to form the history and development of the case at bar.

Trial Court Opinion, 3/19/25, at 29-31 (footnote added; citations to record omitted).

Upon review, we discern no abuse of the trial court's discretion in admitting the challenged testimonial evidence. The testimony contextualized Appellant's relationship with Father and Father's desire to help Appellant. Further, Father's mention of Appellant's prior drug and alcohol use was very

_____

[25] Following Appellant's objection to the introduction of testimony concerning the $300,000.00 loan from Jeanne to Appellant (in particular, Appellant's failure to make repayment under the loan), the trial court and the parties discussed the Rule 404(b) concern in a sidebar. *See* N.T., 10/31/23 (a.m.), at 76-79. The trial court limited testimony about Appellant's failure to repay the loan to the time period following Betty's death, as Appellant identified the loan from Jeanne on the list of debts he detailed for Father, after Father discovered the Trust had been depleted. *See id.* at 79 (trial court stating, "the [c]ourt will allow it, but with limited nexus.").

brief and offered only to explain their estrangement. *See* N.T., 10/31/23 (a.m.), at 80-81. Father also specifically stated that he did not believe Appellant's "financial difficulties" were connected to the drug and alcohol dependency Appellant experienced in high school. N.T., 10/31/23 (p.m.), at 12-13; *see also id.* (Father explaining that when he and Appellant reconnected, Appellant "had been sober for quite a long time, and [Father] was proud of him."); *id.* at 13 (Father indicating Appellant was sober throughout his involvement with the Trust).

While the trial court acknowledged the challenged testimony was "seemingly unpleasant" toward Appellant, Trial Court Opinion, 3/19/25, at 29, a court "is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014) (citation omitted). We agree with the trial court's conclusion that the challenged evidence was not introduced as "bad acts" evidence such that the Commonwealth was required to file a written pretrial notice. Additionally, the trial court did not abuse its discretion in concluding the challenged evidence was relevant to the history and natural development of the case. Accordingly, Appellant's third claim merits no relief.

In his fourth claim, Appellant challenges two jury instructions: a missing witness instruction pertaining to Appellant's failure to call Attorney Siejk; and

a missing evidence instruction concerning Appellant's failure to produce complete income tax returns. Appellant's Brief at 34. Appellant argues that because Attorney Siejk was corporate counsel for Boston Seafood Direct, he was available to both Appellant and the Commonwealth. *Id.* at 36. Appellant also claims Attorney Siejk could offer no information material to the charges, as he lacked special knowledge concerning Appellant's intent or the Trust operations. *Id.* Regarding the missing document charge, Appellant emphasizes that the Commonwealth did not object to the introduction of the tax returns into evidence. *Id.* at 37. According to Appellant, the missing document instruction "essentially told the jury that the documents were inadequate, usurping their role as fact-finders." *Id.*[26]

In assessing jury instructions, we adhere to the following standard of review:

> When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where this is an absolute abuse of discretion or an inaccurate statement of the law is there reversible error.

---

[26] We observe that while Appellant cites to the appropriate standard of review and the elements of the missing witness instruction, Appellant offers no case law in support of his argument. *See* Pa.R.A.P. 2119(a).

***Commonwealth v. Antidormi***, 84 A.3d 736, 754 (Pa. Super. 2014) (citation

and brackets omitted).

We have explained the missing witness instruction as follows:

A missing witness instruction is appropriate where the witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative. Where the party does not present the witness, the jury may be instructed that it can infer that the testimony of the witness would have been unfavorable.

However, a trial court may decline to issue this instruction if the uncalled witness is equally available to both parties, not within the control of the party against whom a negative inference is sought, or there is a satisfactory explanation as to why the party failed to call the witness.

***Commonwealth v. Crumbley***, 270 A.3d 1171, 1185 (Pa. Super. 2022).[27]

The same factors are required to establish the propriety of a missing document

instruction.

_____

[27] Pennsylvania Suggested Standard Jury Instruction (Pa. SSJI (Crim)) 3.21A provides as follows:

3.21A Failure to Call Potential Witness

1. There is a question about what weight, if any, you should give the failure of [a party] [the Commonwealth] [the defendant] to call [person] [*name of person*] as a witness.

2. If [however] three factors are present, and there is no satisfactory explanation for a party's failure to call a potential witness, the jury is allowed to draw a common-sense inference that [his] [her] testimony would have been unfavorable to that party. The three necessary factors are:

*(Footnote Continued Next Page)*

J-S35020-25

Here, the trial court concluded the missing witness and missing document instructions were "warranted based on the evidence presented." Trial Court Opinion, 3/19/25, at 32. The court detailed the pertinent testimony supporting these instructions:

> Appellant stated that after the Trust was formed and he was named as trustee, he brought the [Trust] document to "[Attorney Siejk], and [they] reviewed it together." Further, Appellant, when asked on direct examination whether he consulted with any other lawyers or professional[s] regarding Trust distributions, he indicated that he spoke with Attorney Siejk. That is, Appellant indicated that he spoke with Attorney Siejk regarding utilizing Trust funds to invest in the business that he owned and[,] after so consulting with Attorney Siejk, he "decided to make an investment into the business."
>
> The Commonwealth subsequently requested that th[e trial c]ourt provide the jury with the failure to call potential witness instruction. An argument on the record was held, outside the

_____

*First*, that the person is available to that party only and not to the other;

*Second*, that it appears the person has special information material to the issue; and

*Third*, that the person's testimony would not be merely cumulative.

3. Therefore, if you find these three factors present, and there is no satisfactory explanation for the [party's] [Commonwealth's] [defendant's] failure to call [a person] [*name of person*] to testify, you may infer, if you choose to do so, that [his] [her] testimony would have been unfavorable to [that party] [the Commonwealth] [the defendant].

Pa. SSJI (Crim) 3.21A. The text of Pa. SSJI (Crim) 3.21B (Failure to Produce Document or Other Tangible Evidence at Trial) is substantially identical, merely replacing references to a potential witness with references to the document or tangible item.

- 43 -

presence of the jury, wherein th[e trial c]ourt determined that based on the evidence presented, it would issue the requested instruction.

Additionally, the Commonwealth requested th[e trial c]ourt provide the jury with an instruction related to Appellant's failure to produce document and other tangible evidence at trial. During cross examination of [Father], defense counsel introduced multiple tax returns related to [Father's individual] and [Boston Seafood Direct's] income tax filings for the years 2013, 2014, and 2015…. During direct examination, Mr. Moretti provided testimony that as part of his forensic accounting, he reviewed the Trust document and multiple financial documents related to the Trust account[,] as well [as] Appellant's business and personal accounts. He further testified that following the close of proceedings on October 31, 2023, the Commonwealth provided him with updated tax documents…. Mr. Moretti testified that most of the tax returns that defense counsel introduced through [Father] on the previous day were incomplete. Mr. Moretti indicated that many of the tax schedules were not contained in the purported tax filings. The Commonwealth inquired of Mr. Moretti whether[,] after his review of the newly provided tax documents, his opinion regarding his findings in the forensic accounting changed. Mr. Moretti stated, "No, I would never accept those returns as they were. Number one, they're incomplete[.] Number two, there's no proof of filing.["]

As such, because Appellant, through his counsel, introduced the above-mentioned tax documents at the time of trial, which documents were determined to be incomplete and introduced for the first time at trial, th[e trial c]ourt provided the jury with [the instruction at Pa. SSJI (Crim)] 3.21B….

Trial Court Opinion, 3/19/25, at 32-34 (citations to record omitted; some capitalization modified).[28]

---

[28] We again emphasize that Appellant failed to include the trial exhibits in the certified record. Without the ability to review the tax returns, there is no evidence on which to overturn the trial court's determination.

The jury instruction provided by the trial court mirrored the Pennsylvania Suggested Standard Jury Instructions and accurately stated the law. Discerning no abuse of discretion or reversible error by the trial court in issuing these instructions, we conclude Appellant is not entitled to relief on this claim.

In his fifth and final claim, Appellant contends the trial court erred in determining the amount of restitution. Appellant's Brief at 38 (citing 18 Pa.C.S.A. § 1106(c), explained *infra*). Appellant argues the trial court accepted the Commonwealth's recommendation of $200,322.77, which reflects the gross amount of money withdrawn from the Trust. *Id.* at 39. Appellant argues the trial court failed to consider the sum of $79,001.00, which had been paid to the beneficiaries during the operation of the Trust. *Id.* According to Appellant, by failing to account for this sum, "the trial court's order requires Appellant to pay for losses the beneficiaries never suffered." *Id.* Appellant further argues:

> Appellant testified that he made an additional $8,500.00 payment to the [T]rust in 2017 after collecting on accounts receivable. While the trial court was not required to credit this testimony without documentation, it should have been considered in the restitution calculation. Based on the Commonwealth's own expert testimony, the maximum restitution should be $173,659.00 ($252,666.00 [T]rust value minus $79,001.00 already distributed to beneficiaries). If Appellant's testimony about the additional $8,500.00 payment is credited, the amount should be further reduced to $165,159.00.

*Id.* at 49-50 (citation to record omitted).

"[D]iscontent with the amount of restitution and the evidence supporting it is a challenge to the sentencing court's exercise of discretion, not to the legality of the sentence." **Commonwealth v. Weir**, 239 A.3d 25, 38 (Pa. 2020);[29] **see also Commonwealth v. Biauce**, 162 A.3d 1133, 1139 (Pa. Super. 2017) ("An order of restitution is a sentence, thus, the amount awarded is within the sound discretion of the trial court and must be supported by the record." (citation, quotation marks, and ellipses omitted)). "Criminal defendants do not have the automatic right to challenge the discretionary aspects of their sentence." **Commonwealth v. Karns**, 50 A.3d 158, 166 (Pa. Super. 2012) (citation omitted).

> Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

**Commonwealth v. Solomon**, 247 A.3d 1163, 1167 (Pa. Super. 2021) (*en banc*) (citation and paragraph break omitted).

---

[29] By contrast, the **Weir** Court explained that a challenge to the sentencing court's authority to impose restitution under 18 Pa.C.S.A. § 1106(a) (providing for mandatory restitution where "(1) property of a victim has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime; or (2) the victim, if an individual, suffered personal injury directly resulting from the crime") implicates the legality of the sentence. **Weir**, 239 A.3d at 37-38. Instantly, Appellant does not challenge the trial court's authority to impose restitution.

Instantly, Appellant filed a timely notice of appeal and preserved his challenge to the amount of restitution imposed in a timely post-sentence motion. However, Appellant failed to include the requisite Pa.R.A.P. 2119(f) statement of reasons relied upon for allowance of appeal. Nevertheless, as the Commonwealth did not object to this defect, we may overlook the omission and determine whether Appellant raised a substantial question. *See* *Commonwealth v. Kiesel*, 854 A.2d 530, 533 (Pa. Super. 2004) ("[W]hen the appellant has not included a Rule 2119(f) statement and the appellee has not objected, this Court may ignore the omission and determine if there is a substantial question that the sentence imposed was not appropriate, or enforce the requirements of Pa.R.A.P. 2119(f) *sua sponte*, *i.e.*, deny allowance of appeal."). Finally, we have concluded that a challenge to the amount of restitution imposed by the trial court raises a substantial question. *See* *Solomon*, 247 A.3d at 1167. Thus, we will address the merits of Appellant's claim.

> We observe the following standard of review:
>
> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Zirkle*, 107 A.3d 127, 132 (Pa. Super. 2014) (citation omitted).

- 47 -

"Restitution" is "[t]he return of the property of the victim or payments in cash or the equivalent thereof pursuant to an order of the court." 18 Pa.C.S.A. § 1106(h); *see also Solomon*, 247 A.3d at 1168 ("Restitution is not a fine, but is an equitable remedy under which a person is restored to his … original position prior to loss or injury; it is the restoration of anything to its rightful owner or the act of making good or giving equivalent for any loss, damage or injury." (citation omitted)). The Sentencing Code directs the sentencing court to "order the defendant to compensate the victim of his criminal conduct for the damage or injury that he sustained." 42 Pa.C.S.A. § 9721(c).

Section 1106 of the Crimes Codes (governing restitution for injuries to person or property) provides, in pertinent part, as follows:

**(c) Mandatory restitution.--**

(1) The court shall order full restitution:

(i) Regardless of the financial resources of the defendant, so as to provide the victim with the fullest compensation for the loss. The court shall not reduce a restitution award by any amount that the victim has received from the Crime Victim's Compensation Board or other government agency but shall order the defendant to pay any restitution ordered for loss previously compensated by the board to the Crime Victim's Compensation Fund or other designated account when the claim involves a government agency in addition to or in place of the bard. The court shall not reduce a restitution award by any amount that the victim has received from an insurance company but shall order the defendant to pay any restitution ordered for loss previously compensated by an insurance company to the insurance company.

* * *

(2) At the time of sentencing the court shall specify the amount and method of restitution. In determining the amount and method of restitution, the court:

(i) Shall consider the extent of injury suffered by the victim, the victim's request for restitution as presented to the district attorney in accordance with paragraph (4) and such other matters as it deems appropriate.

(ii) May order restitution in a lump sum, by monthly installments or according to such other schedule as it deems just.

(iii) Shall not order incarceration of a defendant for failure to pay restitution if the failure results from the offender's inability to pay.

(iv) Shall consider any other preexisting orders imposed on the defendant, including, but not limited to, orders imposed under this title or any other title.

* * *

(4)(i) It shall be the responsibility of the district attorneys of the respective counties to make a recommendation to the court at or prior to the time of sentencing as to the amount of restitution to be ordered. This recommendation shall be based upon information solicited by the district attorney and received from the victim.

(ii) Where the district attorney has solicited information from the victims as provided in subparagraph (i) and has received no response, the district attorney shall, based on other available information, make a recommendation to the court for restitution.

(iii) The district attorney may, as appropriate, recommend to the court that the restitution order be altered or amended as provided in paragraph (3).

18 Pa.C.S.A. § 1106(c)(1), (2), (4).

Section 1106 does not set forth a particular quantum of evidence necessary to establish the value of a victim's loss. *See Solomon*, 247 A.3d at 1170. Nonetheless, we have explained that

[r]estitution may be imposed only for those crimes to property or person where the victim suffered a loss that flows from the conduct that forms the basis of the crime for which the defendant is convicted. In other words, when restitution [i]s part of a sentence, there must be a direct nexus between the restitution ordered and the crime for which the defendant was convicted. Further, **the amount ordered must be supported by the record**; it may not be speculative or excessive.

*Id.* (emphasis added; citations and quotation marks omitted).

Here, at the start of the sentencing hearing, the assistant district attorney (ADA) requested restitution in the amount of $200,322.77, to be divided evenly between Father and Uncle. N.T., 1/30/24, at 2. The ADA explained:

> I would rely on Commonwealth's Exhibit 10 from trial. It's the report of [Mr.] Moretti. That was the total amount of withdrawals made from the [T]rust that went into [Appellant's] account, **minus the amount that was provided for the care of his [G]randparents**.

*Id.* (emphasis added).

In response, defense counsel directed the court's attention to Schedule G of Mr. Moretti's report:

> It shows a total of $79,001 was paid to the beneficiaries. Ten thousand of that would have been monies that had been apparently forwarded by the [T]rust and then paid back when the beneficiaries received the insurance check.
> ….
>
> So the amount should be [$]250[,000] minus [$]79,000 and then there was an additional $8,500 paid … by [Appellant] post[-]death of [Betty,] from the business.

*Id.* at 8-9. The trial court set restitution at $200,322.77. *Id.* at 9.

In its opinion, the trial court explained its reasoning regarding the amount of restitution imposed:

[A]t the time of imposition of sentence, the Commonwealth recommended … ordering Appellant pay $200,322.77 in restitution, which would be divided equally between [Father and Uncle] as victims because they were the named beneficiaries of the Trust and stood to receive the funds distributed from the Trust after its termination. The Commonwealth indicated to this [c]ourt that it arrived at that amount of restitution utilizing Mr. Moretti's forensic accounting report[,] wherein Mr. Moretti determined that that was the total net amount of funds that Appellant withdrew from the Trust and deposited into either his personal bank or E-Trade accounts[,] or accounts associated with Boston Seafood Direct.

Appellant, through counsel, indicated that the amount should have been reduced by $8,500.00 due to Appellant's testimony at trial that he paid that amount into the Trust in 2017 after he collected upon certain accounts receivable as he wound down the business prior to its final closure. However, **Appellant neither at the time of trial nor at or after his sentencing hearing, provided any documentation to demonstrate that he remitted an $8,500.00 payment from his business to the Trust**.

Similarly[,] at a hearing held on March 12, 2024, related to Appellant's post-sentence motions, Appellant put forth the same assertion related to the repayment to the Trust of $8,500.00, but failed to provide any evidence to demonstrate its repayment. At the same hearing, the Commonwealth again indicated that the $200,322.77 represented the amount of funds that Appellant withdrew from the Trust account and [paid] into either his personal accounts or business, as demonstrated at the time of trial.

Therefore, because the Commonwealth recommended that this [c]ourt order restitution in the amount of $200,322.77[,] to be divided equally between the victims, and provided documentation demonstrated the accuracy of that amount, this [c]ourt so ordered Appellant to repay restitution in that amount.

Trial Court Opinion, 3/19/25, at 36-37 (emphasis added).

Upon review, we conclude the amount of restitution is supported by the record, and the trial court's reasoning is sound. There is a clear and direct nexus between the restitution ordered and the crimes for which Appellant was convicted. Further, the amount ordered is not speculative, and is instead supported by a forensic accounting (as detailed in Mr. Moretti's expert report). Because the amount of restitution is supported by the evidence of record, we discern no abuse of the trial court's discretion. Appellant's final claim entitles him to no relief.

Based upon the foregoing, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judge Lane joins the opinion.

Judge Olson concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/24/2025